IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. CR-08-02-E-BLW |
| Plaintiff, ) | |
| ) | **FINDINGS OF FACT AND** |
| v. ) | **CONCLUSIONS OF LAW** |
| ) | |
| CORY LEDEAL KING, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## INTRODUCTION

On June 30, 2008, the Court held an evidentiary hearing on defendant King's motion to suppress. Pursuant to Federal Rule of Criminal Procedure 12(d), the Court has made its findings of fact and conclusions of law in this decision. *See United States v. Prieto-Villa*, 910 F.2d 601 (9th Cir. 1990) (stressing importance of district court making factual findings on motions to suppress). For the reasons expressed below, the Court will deny the motion.

## FINDINGS OF FACT

John Klimes is a Senior Livestock Investigator with the Idaho Department of Agriculture (ISDA). In 2005, he received notice that Double C Farms was

**Memorandum Decision and Order – Page 1**

applying to expand its confined animal feeding operation (CAFO). To conduct a necessary inspection in conjunction with that application, Klimes made an appointment with Curtis Taylor, the manager of the Double C feedlot, to meet him on May 23, 2005, at the Double C farm property.

The Double C facility consists of about 11,500 acres of irrigated farmland and a beef feedlot with a capacity of about 20,000 head of beef cattle. Klimes arrived at 11:00 am, but Taylor cancelled the appointment and rescheduled it for 3:00 p.m. Before Klimes left, he was approached by a person who identified himself as a Double C employee. This person told Klimes that he was concerned that the Double C facility was injecting "dirty water" into wells on the property. He urged Klimes to check out the pump valves that very day to confirm that they were set to inject water into the wells instead of pumping water out of the wells. The informant was concerned that later in the day, the valves would be reversed, and the evidence of injection would disappear.

Klimes decided to immediately check the well pumps. He traveled over both public and private roads to reach the wells, which were all on private ground.[1] In driving to the first well, Klimes tracked the waste water coming from a feed lot and

---

[1] The parties stipulated at the suppression hearing that all the wells were on private ground and that Klimes had to travel over both public and private roads to access the wells.

**Memorandum Decision and Order – Page 2**

eventually into an irrigation pond. A pump at the pond was running, and pressure gauges indicated that water was traveling through the pipe, but no water was coming out of the nearby pivots. He could not tell where the water was going. At other wells, however, he determined that the water was being injected into the wells.

Klimes returned later that day and found that the valves had been reversed, and the water was no longer being injected into the wells. He met with Taylor at 3:00 p.m., and told him that the injection violations would compel further inspections. Taylor agreed.

Klimes returned on May 26 and 31, 2005, and again on June 2, 2005, to inspect the Double C facilities. At the June 2, 2005, meeting, Klimes asked if he could test the wells where injections may be taking place. King responded that he had not yet turned on the well pumps but when he did, he would call and let them test the wells.

On June 15, 2008, the ISDA, and other agencies, obtained an administrative warrant to entry and inspection of the Double C facility. However, the warrant was never executed, and no inspections or sampling was ever conducted under the warrant.

On June 16, 2005, King gave his verbal permission to take water samples

**Memorandum Decision and Order – Page 3**

from the wells, and his written permission to inspect the premises. Craig Tesch, a hydrologist with the ISDA, took samples on June 16, 2005, and June 21, 2005. To physically take the samples, Tesch relied on the assistance of Jose Guerrero, a Double C employee, who accompanied the testing group and provided help at each well.

## CONCLUSIONS OF LAW

King seeks to exclude all the evidence obtained by Klimes, Tesch, and other state agency officials during their inspections of the Double C facility in May and June of 2005. At the beginning of the suppression hearing, the Government's counsel stated that he would not be introducing into evidence any water samples collected by Klimes. The Government still seeks to introduce, however, Klimes' testimony regarding his inspections in May of 2005, and his observations of the valves being reversed and the injections of water into the wells. Counsel further represented that he would be introducing water samples taken by Tesch on June 16 and 21, 2005.

Klimes investigation began on May 23, 2008, when a Double C employee told him about the well injections, and he drove out to inspect the wells, which were on private property. The location of these wells was depicted in photographs, *see Government Exhibits* 1 to 32, clearly showing that they are "open fields," far

**Memorandum Decision and Order – Page 4**

outside what might be considered the "curtilage" of the home. *See United States v. Roberts*, 747 F.2d 537 (9th Cir. 1984). The special protection accorded by the Fourth Amendment to people in their homes is not extended to open fields, and thus Klimes needed neither a warrant nor probable cause to inspect wells in open fields. *Oliver v. United States*, 466 U.S. 170, 177-78 (1984).

King argues that Klimes did not have his consent – or the consent of anyone – to inspect the wells on private property. Because Klimes was trespassing, King argues, the fruits of his inspections on May 23, 2005, and thereafter must be excluded from evidence.

The parties stipulated that Klimes had to travel over private roads to get to the wells, which were all on private property. Assuming, *arguendo*, that Klimes was violating state trespass laws, this would not result in exclusion as a remedy under the Fourth Amendment. *See Virginia v. Moore*, 128 S.Ct. 1598 (2008) (holding that "whether or not a search is reasonable within the meaning of the Fourth Amendment . . . has never depended on the law of the particular state in which the search occurs"). *Id.* at 1604; *see also*, *United States v. Eastland*, 989 F.2d 760 (5th Cir. 1993) (holding that trespass by state officials did not trump open fields doctrine and warrant exclusion).

In *United States v. Cormier*, 220 F.3d 1103, 1111 (9th Cir. 2000), the Circuit

**Memorandum Decision and Order – Page 5**

held that evidence will only be excluded in federal court when it violates federal protections, such as those contained in the Fourth Amendment, and not in cases where it is tainted solely under state law. *Cormier* recognized that exceptions exist to this general rule, and cited as examples *United States v. Wanless*, 882 F.2d 1459 (9th Cir. 1989) and *United States v. Mota*, 982 F.2d 1384 (9th Cir. 1993). *Mota* and *Wanless* stand for the proposition that some tests under the Fourth Amendment necessarily rely on state law in the way they are defined. *Cormier*, 220 F.3d at 1111. Those exceptions do not apply here.

King cites the requirement in the Beef Cattle Act that inspectors must have either consent to search or a warrant for inspections under Act. He points out that those inspections would have to be done in "open fields" and thus argues that the Act was designed to trump the open field doctrine by expanding the curtilage around the home to include open fields, at least for inspections under the Act.

King's citation to the Beef Cattle Act is simply a variation of his argument citing state trespass laws. State trespass laws could likewise be deemed to be state attempts to curtail the open fields doctrine by expanding the curtilage around one's home. Yet the Supreme Court and this Circuit have consistently rejected such arguments, and the Court will follow that precedent, cited above.

Under all these circumstances the Court finds reasonable Klimes'

**Memorandum Decision and Order – Page 6**

inspections conducted in May.  Turning to the June inspections and sampling, the Court finds that they were authorized by King's consent.  As discussed above, King gave his written consent to "inspect the wells."  *See Government Exhibit* 24.  While this phrase does not mention the taking of a sample, the word "inspect" has such a broad meaning that it would include sampling.  Moreover, the testimony of Klimes showed that King gave his verbal consent to sampling on June 16, 2005, in response to requests made by state officials visiting King that day.  To further confirm that consent, Double C employee Jose Guerrero accompanied the testers and assisted them at each well in taking water samples.

      The Court therefore finds that the Government carried its burden of showing that the scope of the search did not exceed the scope of the consent.  *See United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006).  This consent renders any discussion of probable cause unnecessary for the June inspections and samples.  *See* LaFave*, Search and Seizure*, § 8.1 (4th ed. 2004) (stating that "[i]f a valid consent is obtained, then clearly there is no additional requirement of probable cause for the search").

      For all these reasons, the Court will deny the motion to suppress.

**Memorandum Decision and Order – Page 7**

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to suppress (Docket No. 21) is DENIED.



DATED: **July 11, 2008**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order – Page 8**