IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. CR-08-002-E-BLW |
| Plaintiff, ) | |
| ) | **MEMORANDUM DECISION** |
| v. ) | **AND ORDER** |
| ) | |
| CORY LEDEAL KING, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## INTRODUCTION

The Court has before it Cory Ledeal King's motions to dismiss the indictment on federalism principles (Docket No. 75), to disclose grand jury transcripts (Docket No. 18), and to amend/correct facts in the order on the motion to suppress (Docket No. 54). For the reasons set forth below, the Court will deny King's motion to dismiss and motion to disclose grand jury transcripts, but will grant King's motion to correct/amend.

## BACKGROUND

King is the manager of the Double C Farms Partnership/Lambert Produce farm and cattle feedlot located near Burley, Idaho. He has been charged with four counts of willfully failing to comply with the Safe Drinking Water Act (SDWA),

and corresponding Idaho law, by injecting water into wells without a permit, and one count of making a false statement to an investigator. The factual background leading to these charges was fully set forth in a separate decision on King's motion to suppress, and will not be repeated here.

## ANALYSIS

### A. King's Motion to Dismiss on Federalism Principles

King asserts that the four counts alleging illegal injection rely on a provision of the SDWA that oversteps Congress's power under the Commerce Clause and thus violates the Tenth Amendment. Those four counts allege that King willfully injected water into a "waste disposal and injection well" in violation of Idaho Code §§ 42-3903, -3911. Those sections are part of the SDWA's federally mandated Underground Injection Control (UIC) program, *see* 42 U.S.C. §§ 300h to h-8, which authorizes federal enforcement of federally approved state UIC programs, *see id.* at § 300h-2. For the reasons set forth below, the Court concludes that federal enforcement is constitutional.

#### 1. The Statutory Scheme

##### a. Safe Drinking Water Act

The SDWA directed the Environmental Protection Agency (EPA) to set minimum standards for state UIC programs, which must prohibit any "subsurface

**Memorandum Decision and Order – Page 2**

emplacement of fluids by well injection" not authorized by a state permit.  42 U.S.C.§ 300h(b), (d)(1).  The permit applicant has the burden of showing that his injection will not be conducted "in a manner that allows the movement of fluid containing any contaminant into underground sources of drinking water."  40 C.F.R. § 144.12.  As the Court previously held, the "SDWA was designed as a 'fence,' *i.e*, designed to prevent contamination by requiring all underground injections to be vetted in the permit process before the injections take place."  *See* Docket No. 77 at 5.

The legislative history of the SDWA is illustrative of why Congress enacted this prophylactic measure.  *See* H.R. REP. NO. 93-1185 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6454.  The overall purpose of the SDWA is to "assure that water supply systems serving the public meet minimum national standards for protection of public health."  *Id.* at 6454.  In considering the legislation, Congress found that "certain economic, industrial, agricultural, and environmental practices have resulted in increasing concentrations of potentially harmful chemicals entering the Nation's drinking water sources."  *Id.* at 6459.  Congress further found that "[e]nvironmental requirements limiting atmospheric and surface disposal of waste ha[d] made underground disposal practices more attractive from an economic standpoint."  *Id.*; *see also id.* at 6461 (specifically mentioning rise in

**Memorandum Decision and Order – Page 3**

"subsurface injection").

As to the need for federal involvement, "the causes and effects of unhealthy drinking water are not confined within the borders of State and local jurisdictions." *Id.* at 6461. Ultimately, "the solution to the problem . . . must be found in a cooperative effort in which the Federal government assists, reinforces, and sets standards for the State and local efforts." *Id.* at 6461. Contaminants "may cross state boundaries" because "water in the hydrologic cycle does not respect state borders." *Id.* Without legislation, waterborne disease outbreaks would "inhibit interstate travel and tourism," reduce economic productivity, and spread across state lines. *Id.* Significantly, Congress found that "contaminants which endanger the public health when present in drinking water are frequently generated by business engaged in or enterprises affecting interstate commerce." *Id.*

Congress created the UIC program as one means of achieving the SDWA's objectives. *See id.* at 6480-87. Congress found that, at that time, only ten states "reject or discourage" the use of underground injection as a means of waste disposal, and found that "underground injection of contaminants is clearly an increasing problem." *Id.* at 6481. It further found that municipalities, industries, energy production companies, and even government agencies were contributing to the problem by injecting various wastes. *Id.* The UIC program addresses those

**Memorandum Decision and Order – Page 4**

"situations insofar as they may endanger underground drinking water resources." *Id.*

Congress intended to term "'underground injection' . . . to be broad enough to cover any contaminant which may be put below ground level and which flows or moves." *Id.* at 6483. While it "[did] not intend this definition to apply to septic tanks or other individual residential waste disposal systems, it [did] intend that the definition apply to a multiple dwelling, community, or regional system of injection of waste." *Id.*

The EPA has carried forth Congress's intent to limit the scope of the definition of "underground injection" in 42 U.S.C. § 300h(d)(1). The EPA regulations list five classifications of "injection wells" covered under the UIC program. *See* 40 C.F.R. § 144.6. The classifications include many industrial wells, such as those used to dispose of hazardous wastes, radioactive wastes, and wastes generated in gas and mineral extraction. *See id.* The regulations specifically state, however, that the "UIC requirements do not apply to single family residential septic system wells, nor to non-residential septic system wells which are used solely for the disposal of sanitary waste and have the capacity to serve fewer than 20 persons a day." *Id.* at § 144.81(9).

**Memorandum Decision and Order – Page 5**

### b.     Idaho's Underground Injection Control Program

The portion of Idaho's EPA-approved UIC plan at issue here is Idaho Code §§ 42-3903, -3911.  *See* 40 C.F.R. §§ 147.650-51.  Idaho's statute prohibits the use of any "waste disposal and injection well" without a permit, I.C. § 42-3903, and provides that such use without a permit is a misdemeanor, I.C. § 42-3911.  The term "waste disposal and injection well" is defined as an "injection well" more than 18 feet deep.  *See id.* at § 42-3902(19).  To be an "injection well," the well must be (1) "a bored, drilled or dug hole, or is a driven mine shaft or a driven well point," (2) "deeper than its largest straight-line surface dimension," and (3) "used for or intended to be used for injection."  *Id.* at § 42-3902(8).  The term "injection" means the "subsurface emplacement of fluids."  *Id.* at § 42-3902(7).

### c.     Enforcement of Idaho's program

The injection of fluid into a well meeting the above specifications, without a permit, is a crime regardless of whether the fluid is a contaminant and regardless of whether the injection actually endangers or contaminates an underground source of drinking water.  *See* Docket No. 77 at 4-5.  The SDWA provides that any person who willfully violates any requirement of a federally approved state program may be imprisoned for up to 3 years and/or fined.  *See* 42 U.S.C. § 300h-1(d), 300h-2(b)(2); *see also* Docket No. 57 at 5. Although Idaho has the primary enforcement

**Memorandum Decision and Order – Page 6**

authority for violations of its permit requirement, the administrator of the EPA retains authority to enforce a state's approved UIC program if the state fails to do so. *See* 42 U.S.C.§ 300h-1(b), 300h-2(a), (b). Additionally, to the extent that Idaho's UIC program could be construed as having a "greater scope" than the requirements in the SDWA or EPA regulations, the "additional coverage" is not part of the "federally approved program," and thus not enforceable by federal authorities. 40 C.F.R. § 145.1(g)(2).

### 2. The Commerce Clause

"Due respect for the decisions of a coordinate branch of Government demands that [a court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). There are three general categories of regulation in which Congress is authorized to engage under its commerce power: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005).

**Memorandum Decision and Order – Page 7**

At issue here is the third category.¹  Courts "need not determine whether [the regulated] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Raich*, 545 U.S. at 22 (citing, among others, *Hodel v. Virginia Surface Min. and Reclamation Ass'n, Inc.*, 452 U.S. 264, 276-80 (1981)).  There are four considerations: (1) the commercial or economic nature of the intrastate activity; (2) the presence of a jurisdictional element in the statute; (3) the existence of congressional findings or legislative history demonstrating a link between the regulated activity and interstate commerce; and (4) the attenuation of the link between the intrastate activity and its effect on interstate commerce.  *See Morrison*, 529 U.S. at 609-12; *United States v. Lopez*, 514 U.S. 549, 559-64 (1995).

*Lopez* and *Morrison* are instructive on the limits of Congress's power.  The regulated activities in those cases – possession of a gun in a school zone in *Lopez* and violence against women in *Morrison* – failed the four-part scrutiny.  *Morrison*,

---

¹ The government asserts that the second category also applies, relying on *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941 (1982), and *Nebraska v. EPA*, 331 F.3d 995 (D.C. Cir. 2003).  The Court disagrees.  *Sporhase* dealt with the applicability of the Dormant Commerce Clause to a Nebraska law restricting sale and transport of the state's groundwater across state lines.  *See* 458 U.S. at 953-54.  *Nebraska v. EPA* addressed SDWA regulations, unrelated to the UIC program, which set permissible arsenic levels in drinking water sold as an instrumentality of interstate commerce by utilities.  *See* 331 F.3d at 998-99.  Both cases are inapplicable here because the UIC program is not designed to protect underground drinking water sources solely for their use as an instrumentality of interstate commerce.

**Memorandum Decision and Order – Page 8**

529 U.S. at 617; *Lopez*, 514 U.S. at 567.  Both were cases in which "neither the actors nor their conduct ha[d] a commercial character, and neither the purposes nor the design of the statute ha[d] an evident commercial nexus."  *Morrison*, 529 U.S. at 611 (quoting *Lopez*, 514 U.S. at 580 (Kennedy, J., concurring)).

Generally, however, Congress has broad power when it regulates activities that are "quintessentially economic," and "[e]conomics" refers to "the production, distribution, and consumption of commodities."  *Raich*, 545 U.S. at 25.  "Examples include the regulation of intrastate coal mining, intrastate extortionate credit transactions, restaurants utilizing substantial interstate supplies, inns and hotels catering to interstate guests, and production and consumption of homegrown wheat." *Lopez*, 514 U.S. at 559-60 (internal citations and quotations omitted) (collecting cases).  Furthermore, in *Raich*, the Supreme Court reaffirmed that Congress can even regulate "purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity."  *Raich*, 545 U.S. at 18 (relying on *Wickard v. Filburn*, 317 U.S. 111 (1942), to uphold regulation of intrastate cultivation and possession of marijuana for personal medical use); *see also United States v. McCalla*, 545 F.3d 750, 755-56 (9th Cir. 2008) (homemade child pornography)*; United States v.*

**Memorandum Decision and Order – Page 9**

*Stewart*, 451 F.3d 1071, 1078 (9th Cir. 2006) (homemade machine gun).

### 3.     Application

Preliminarily, it is necessary to characterize King's challenge.  *See Raich*, 545 U.S. at 23 (noting *Morrison* and *Lopez* both involved challenges to the whether the entire provision fell outside Congress's power, while *Raich* merely involved an "as applied" challenge).   King asserts that the facts alleged in the complaint are unproven and irrelevant, and thus he appears to invoke a facial challenge.  That generally requires a showing that the challenged statute would be constitutional under "no set of circumstances."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  King asserts that the *Salerno* test does not apply to Commerce Clause challenges.  But there is no basis for this assertion, and he provides no alternative test.  *See Washington State Grange v. Washington State Republican Party*, 128 S.Ct. 1184, 1190-91 & n.6 (2008) (noting that, although *Salerno* has been criticized, "all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep,'" and further noting the only recognized exception to *Salerno* is in the First Amendment context (internal quotations omitted)); *Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.*, 498 F.3d 1031, 1049 (9th Cir. 2007) (applying *Salerno* test in a preemption challenge to state air quality rules).

**Memorandum Decision and Order – Page 10**

The proper inquiry, therefore, is whether Idaho's federally approved UIC plan falls entirely outside Congress's commerce power. In making that determination, the Court may consider whether application to King's alleged conduct is one permissible application that renders the regulatory scheme facially valid.

### a.     Economic nature of regulated activity

The Congressional findings demonstrate that the UIC program was designed to regulate a growing practice of waste disposal through underground injection, and that this practice is economic in nature. Such disposal became "more attractive from an economic standpoint" after federal pollution legislation restricted use of other methods of disposal. 1974 U.S.C.C.A.N at 6459. The UIC program was intended to curtail the harmful disposal practices of municipalities, industries, energy production companies, and even government agencies. *Id.* at 6481. Consistent with Congress's intent, the EPA has interpreted the UIC program's permit requirement as not covering sanitary septic tanks for single family homes, or even those for non-residential purposes capable of serving less than 20 people per day. *See id.* at 6483; *see also* 42 U.S.C.§ 300h(d)(1); 40 C.F.R. § 144.81(9).

Idaho's EPA approved program is unlikely to affect non-commercial actors. It only covers injections of fluids in wells over 18 feet deep that are: (1) bored,

**Memorandum Decision and Order – Page 11**

drilled, dug, or driven, (2) deeper than the surface width, and (3) at least intended to be used for injection.  I.C. § 42-3902(8).  It is difficult to imagine many circumstances where one would go to the trouble of injecting fluids so deep while engaging in non-commercial activities.  Further, to the extent this covers injection wells not covered by the EPA regulations, it is not part of the federal program at issue here.  40 C.F.R. § 145.1(g)(2).

Although King challenges the entire program, its application to the facts alleged in this case are demonstrative.  King runs a commercial farm.  *Superseding Indictment*, Docket No. 7, at ¶ 1.  His alleged conduct triggering federal enforcement was to inject fluids from a pond containing waste from the farm's cattle feedlot operation, or from elsewhere on the farm, into irrigation wells over 18 feet deep, without a permit to do so.  *See id.* at ¶¶ 4-16, 22.  Unlike in *Morrison* and *Lopez*, both the actor (a commercial farmer) and his alleged conduct (the disposal of the farm's waste) have a plainly economic character.

King's regulated activity is clearly economic under any formulation. *Compare Rancho Viejo, LLC. v. Norton*, 323 F.3d 1062, 1072 (D.C. Cir. 2003) (focusing on developer's construction activity, which could incidentally "take" endangered toads), *with Rancho Viejo, LLC v. Norton*, 334 F.3d 1158, 1160 (D.C. Cir. 2003) (Roberts, J. dissenting from denial of rehearing en banc) *and GDF*

**Memorandum Decision and Order – Page 12**

*Realty Investments, Ltd. v. Norton*, 326 F.3d 622, 636 (5th Cir. 2003) (both concluding "regulated activity" is prohibited takes of endangered species incidental to commercial operation, not the commercial operation itself).  It makes no difference whether the regulated activity is characterized as King's commercial farming on the whole or his unlawful injection.  Both are commercial in nature.

        **b.**    **Congressional findings and effect on interstate commerce**

Congress's extensive findings establish a rational basis to conclude the regulated activity affects interstate commerce.  Congress made extensive findings on the impacts of degradation of drinking water on the interstate economy.  *See* 1974 U.S.C.C.A.N. at 6457-61.  Congress feared that, without legislation, waterborne disease outbreaks would, among other things, inhibit interstate travel and tourism, reduce economic productivity, and spread across state lines.  *Id.* at 6461.  Congress noted that underground drinking water supplies and illnesses caused by contaminants do not abide by state lines, and thus degradation would have interstate impacts.  *Id.*  The Commerce Clause is "broad enough to permit congressional regulation of activities causing air or water pollution, or other environmental hazards that may have effects in more than one State."  *Hodel*, 452 U.S. at 282; *see also id.* at 277-80 (relying on Congressional findings of environmental harm to uphold regulation of intrastate coal mining).

**Memorandum Decision and Order – Page 13**

King argues that the Congressional findings for the SDWA merely pay lip service to the effects on interstate commerce.  The Court disagrees.   But even if King were correct, "the absence of particularized findings does not call into question Congress' authority to legislate." *Raich*, 545 U.S. at 21.  That a substantial degradation of underground drinking water supplies could have a substantial impact on the national economy is obvious. *See Hodel*, 452 U.S. at 282.

Additionally, the Court rejects King's argument that some applications of the UIC program have no effect on interstate commerce.  "[C]ourts have a strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration[.]" *United States v. Clark*, 435 F.3d 1100, 1110 (9th Cir. 2006) (internal quotation omitted).  Further, all that "is required is an evaluation of '*the precise object or activity* that, in the aggregate, substantially affects interstate commerce.'" *Rancho Viejo, LLC.*, 323 F.3d at 1072 (quoting *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 173 (2001)) (emphasis in *Rancho Viejo, LLC*.).  It is also significant that Congress may regulate a small subclass of intrastate, noncommercial activity encompassed within the regulatory scheme if failure to do so "would undercut the regulation of the interstate market." *Raich*, 545 U.S. at 18.

**Memorandum Decision and Order – Page 14**

Here, to the extent there could be a subclass of intrastate, noncommercial injections over 18 feet deep, not exempted under the EPA regulations, *see* 40 C.F.R. § 144.81(9), such injections are not at issue and seem too few and far between to invalidate the entire scheme.  King also takes issue with a federal permit requirement for intrastate injections of fluid with no contaminants, made a great distance from any underground drinking water source.  King's argument overlooks the obvious difficulty which state or federal authorities face in protecting underground drinking water sources against a variety of threats.  As the Court previously concluded, Congress designed the SDWA to be "prophylactic in nature" and to "prevent contamination by requiring all underground injections to be vetted in the permit process before the injections take place."  *See* Docket No. 77 at 5.  Without the permit requirement, the states and the EPA would have the impossible task of determining which injections were actually threatening drinking water sources prior to enforcing the SDWA's prohibitions.  Thus, even for activities that may prove harmless to the drinking water and interstate commerce, the permit requirement is necessary to a meaningful scheme of enforcement.  *See Raich*, 545 U.S. at 18.

        **c.**    **Lack of a jurisdictional element**

The SDWA and EPA regulations contain no express jurisdictional "hook"

**Memorandum Decision and Order – Page 15**

that limits federal enforcement to, for example, injections "affecting commerce." *See Morrison*, 529 U.S. at 611-12; *Lopez*, 514 U.S. at 561-62; *see also United States v. Bass*, 404 U.S. 336, 349-50 (1971). This is only a requirement, however, if "Congress seeks to regulate a purely intrastate noncommercial activity that has traditionally been subject to exclusive regulation by state or local government, and where the connection of the regulated activity as a whole to interstate commerce is neither readily apparent nor illuminated by express congressional findings." *Brown v. Investors Mortg. Co.*, 121 F.3d 472, 476 (9th Cir. 1997) (internal quotation omitted). As discussed above, that is not the case here. Thus, there is no need for a jurisdictional element in this case.

King finally asserts that the lack of a jurisdictional element violates the requirement of the Fifth and Sixth Amendments that "the jurisdictional inquiry must be resolved by a jury" if that inquiry turns on "factual issues." *United States v. Perlaza*, 439 F.3d 1149, 1167 (9th Cir. 2006) (internal quotation marks and alterations omitted). There are no factual issues to resolve here, and hence no Fifth or Sixth Amendment violations, because the entirety of Idaho's federally approved UIC program is within Congress's commerce power.

### d. Conclusion

Idaho's federally approved UIC program regulates economic activity, and a

**Memorandum Decision and Order – Page 16**

rational basis exists to conclude that regulated activity substantially affects interstate commerce. Indeed, the program's application to King's own alleged conduct provides one of many possible examples of a constitutional application. Because it is a valid exercise of Congress's Commerce Clause authority, it does not violate the Tenth Amendment. *See United States v. Darby*, 312 U.S. 100, 124-25 (1941). The Court will therefore deny King's motion to dismiss.

### B.     King's Motion to Disclose Grand Jury Transcripts

The Court will next address King's motion to disclose grand jury transcripts (Docket No. 18). Pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E), King seeks disclosure of transcripts of all testimony to the grand jury and the government's instructions to the grand jury. The government opposes this motion.

Generally, "[p]arties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice . . . , that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979). The "particularized need" standard "does not sanction across the board fishing expeditions by defense counsel who, under the Jencks Act, [18 U.S.C. § 3500], are entitled to the pretrial statements of Government witnesses at the time of trial."

**Memorandum Decision and Order – Page 17**

*United States v. Kim*, 577 F.2d 473, 478 (9th Cir. 1978).

Furthermore, errors occurring during grand jury proceedings rarely require dismissal of an indictment. An indictment valid on its face cannot be challenged on the ground that the evidence presented to the grand jury was inadequate. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261 (1988). There must be a showing of "flagrant deception" or "overreaching," such as where the prosecutor knowingly presents perjured testimony to the grand jury on a material matter. *United States v. Fritz*, 852 F.2d 1175, 1178 (9th Cir. 1988); *United States v. Samango*, 607 F.2d 877, 882-84 (9th Cir. 1979). Thus, even "[e]rroneous grand jury instructions do not automatically invalidate an otherwise proper grand jury indictment." *United States v. Wright*, 667 F.2d 793, 796 (9th Cir. 1982).

According to King, he is entitled to disclosure to investigate why the grand jury changed the characterization of the injected fluid in the initial indictment from "process wastewater" to "water and/or other fluids" in the superseding indictment. *See* Docket Nos. 1, 7. King speculates that the government may have improperly summarized prior grand jury testimony or improperly instructed the grand jury.

Both arguments fail. First, the SDWA does not require that the injected fluids had contaminants. *See* Docket No. 77. The superseding indictment is valid on its face in this regard. Second, even if the government may have presented

**Memorandum Decision and Order – Page 18**

summarized testimony to the grand jury, that fact alone does not support King's contention that he is entitled to analyze such summaries. *See United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986).

The need for secrecy is reduced, but not eliminated, now that the grand jury is no longer convened, and King will have access to grand jury testimony potentially useful for impeachment at trial. *See* 18 U.S.C. § 3500; Fed. R. Crim. P. 26.2. Because King has failed to make the required showing of a particularized need for earlier disclosure, or disclosure of any additional portions of grand jury transcripts, the Court will deny his motion.

**C.     King's Motion to Amend the Facts in the Order on Motion to Suppress**

Next, King filed a motion (Docket No. 54) to amend/correct facts in the Court's Findings of Fact and Conclusions of Law Denying the Motion to Suppress (the Order) (Docket No. 52), and the government has not filed an opposition to King's motion. The Court will therefore grant King's unopposed request to strike the word "injection" on page 3, line 8 of the Order, and replace it with the word "feedlot," and strike the date "June 21, 2005," on page 4, line 2 of the Order, and replace it with "June 28, 2005."

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that Cory Ledeal King's motion to dismiss the indictment on federalism principles (Docket No. 75) is DENIED.

IT IS FURTHER ORDERED, that Cory Ledeal King's motion to disclose grand jury transcripts (Docket No. 18) is DENIED.

IT IS FURTHER ORDERED, that Cory Ledeal King's motion to amend/correct facts in the Findings of Fact and Conclusions of Law Denying the Motion to Suppress (Docket No. 54) is GRANTED, and the Court hereby STRIKES the word "injection" on page 3, line 8 of the Findings of Fact and Conclusions of Law Denying the Motion to Suppress (Docket No. 52), and replaces it with the word "feedlot."  The Court also STRIKES the date "June 21, 2005," on page 4, line 2 of the Findings of Fact and Conclusions of Law Denying the Motion to Suppress (Docket No. 52), and replaces it with "June 28, 2005."

DATED:  **April 6, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge