## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. CR-08-002-E-BLW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| CORY LEDEAL KING, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it Cory Ledeal King's motion for a new trial (Docket No. 150), and his renewed motion for judgment of acquittal (Docket No. 151). The Court has carefully considered the written submissions[1] and oral arguments of counsel and, for the reasons set forth below, the Court will deny both motions.

## BACKGROUND

The government charged King with four counts of willfully failing to comply with the Safe Drinking Water Act (SDWA), and corresponding Idaho law,

---

[1] Following oral argument, counsel for King brought to the Court's attention, the decision of the Ninth Circuit Court of Appeals in *U.S. v. King*, No. 08-10047 (August 18, 2009). The Court has reviewed the *Reyes* decision but is not persuaded that it suggests an analysis or result different from that set forth in this decision.

by injecting water into wells without a permit, and one count of making a false statement to an investigator.  The factual background leading to these charges was fully set forth in the Court's pretrial decisions, and will not be repeated here.  The case proceeded to trial, and after the close of evidence King moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  The Court denied King's motion.  *See* Trial Tr. at pp. 536-48.  The jury found King guilty of all charges.

Now, King's new trial motion challenges the government witnesses's references to "wastewater" at trial, the government's compliance with discovery rules regarding testimony of Jose Guerrero, and the government's presentation of testimony of John Chatburn.  It challenges also the Court's admission of the testimony of James Stanton and Exhibit 1-1, and the government's refusal to more promptly accept King's proffer of stipulated facts.  Additionally, King's renewed motion for judgment of acquittal challenges the sufficiency of the evidence on all charges.

## ANALYSIS

### A.    New Trial Motion

#### 1.    Legal standard

A new trial may be granted by the district court when the "interest of justice

**Memorandum Decision and Order – page 2**

so requires." Fed. R. Crim. P. 33(a); *see also United States v. Mack*, 362 F.3d 597, 600 (9th Cir. 2004).

      **2.**     **Application**

          **a.**     **References to "wastewater"**

King asserts that the government's repeated references to wastewater warrant a new trial. Pretrial, the Court rejected the government's argument that evidence of injection of wastewater, as opposed to any other fluid, was "inextricably intertwined" with evidence of the conduct underlying King's offenses. *See* Docket No. 106 at pp. 3-6. The Court did not, however, preclude admission of evidence on the nature of the injected fluids if offered for some other relevant purpose, *see id.* at p. 6 n.1, and the Court likely would have admitted such evidence if the government had argued it was relevant to King's willful intent. But the government never made such an argument, and both parties remained subject to the Court's order to avoid the wastewater issue. King moves for a mistrial claiming the government presented evidence on four occasions that implied he injected wastewater, and he was unable to rebut that implication with evidence that the injected fluids consisted of harmless surface runoff.

First, Environmental Protection Agency (EPA) Special Agent Kelly O'Neill described the initial allegations as: "[t]here were indications that there was un-

**Memorandum Decision and Order – page 3**

permitted injection of wastewater into deep-water irrigation wells at the facility."
Trial Tr. at p. 61.  The Court denied the motion for a mistrial.  Trial Tr. pp. 62-63.

King cites no references to wastewater by the next two government witnesses, John Chatburn and James Stanton.  Before the testimony of the fourth witness, Dean Smith, the Court decided to provide a limiting instruction to the jury with the input and consent of counsel.  *See* Trial Tr. at pp. 193-95.  The Court stated, in relevant part:

> [T]here is (sic) no allegations in the case and there has been and will be no evidence that any chemicals were ever injected at any time relevant to these proceedings into any of the wells in question.  So you're not to concern yourself with that issue, as well;

> And, third, what was or was not in the fluid which the government alleges was injected into the wells in question is not at issue in these proceedings.  You are not to concern yourself with what was or was not in the fluids.  Simply put that matter out of your mind, and do not concern yourself with that question at all.

Trial Tr. at p. 196.

King next moved for a mistrial twice during John Klimes's testimony.  In referring to his initial contact with Double C employee Shaun Carson, Klimes testified: "He advised me that the pond had broken, that waste was running –."  Trial Tr. at p. 230.  The Court sustained King's objection to this testimony and

**Memorandum Decision and Order – page 4**

offered to instruct the jury to disregard it, but denied King's motion for a mistrial. Trial Tr. at. p. 231.  Shortly thereafter, the Court admitted, for illustrative purposes, a diagram of injection methods, Exhibit 9-66.  Trial Tr. at p. 305.  The government mistakenly displayed an unsanitized version of a diagram depicting a "waste pond" as the source of injections into a well.  Although this diagram only appeared on the projection screen visible to the jury for a few seconds, King has submitted post-trial affidavits from several spectators at trial, who allege they had time to read the words "waste pond."  The Court denied King's motion for a mistrial, and offered to provide an additional jury instruction.  Trial Tr. at p. 233-34.

Finally, King points to testimony of Shaun Carson, wherein Carson testified, before being cut off by the prosecutor, as to his initial contact with Klimes.  Carson testified "he had something to do with nutrient management.  And I took that to mean waste, and –."  Trial Tr. at p. 481.  The Court denied King's motion for a mistrial, ruling the testimony pertained only to nutrients used on crops.  Trial Tr. at p. 481-82.

King did not request the opportunity to present evidence negating the implication that the injected fluids contained wastewater.  Also, King never requested a further limiting instruction, but in the post-proof jury instructions, the Court instructed the jury not to consider evidence it had been instructed to

**Memorandum Decision and Order – page 5**

disregard during the trial.  Trial Tr. at p. 563.

Upon re-examination, the Court is still convinced that the government's inadvertent references to waste and wastewater did not prejudice King.  The Court's limiting instruction cured any prejudice that the inadvertent references could have caused.  *See United States v. Randall*, 162 F.3d 557, 559-60 (9th Cir. 1998) (noting that juries are presumed to heed cautionary instructions).  Further, King and the government both stipulated that the alleged injections consisted of surface water injections from creeks, which helped to dispel any implication that King injected wastewater.  Trial Tr. at pp. 462-65.  The improper references were not extensive when viewed in the context of the entire trial, and the limiting instructions and the stipulations cured any prejudice.

### b.      Discovery of Jose Guerrero's testimony

King asserts that the government must have violated the Jencks Act, 18 U.S.C. § 3500, or Federal Rule of Evidence 404(b) by failing to disclose prior statements of Jose Guerrero regarding a conversation with King in 2000, when King directed construction of the bypass valve at Idaho State Department of Agriculture (ISDA) well no. 5.  At trial, Jose Guerrero testified: "I asked him about the valve . . . if somebody find out, what we going to say," and "he just told me to – just pointed me, just go to that pivot, which is Pivot No. 13."  Trial Tr. at p. 387.

**Memorandum Decision and Order – page 6**

The government asserts that Guerrero relayed the statement regarding the bypass valve at a November 2008 interview.  The government asserts that it intended to include Jose Guerrero's testimony at issue here in its trial brief, but inadvertently failed to do so.  Nevertheless, the government asserts that it created no contemporaneous, written recording of Guerrero's statement subject to the Jencks Act, and the testimony was not Rule 404(b) evidence.

The Jencks Act requires the government to disclose a witness's prior statements, and even an investigator's notes may contain such discoverable statements.  *See United States v. Ogbuehi*, 18 F.3d 807, 810-11 (9th Cir. 1994); *United States v. Boshell*, 952 F.2d 1101, 1104 (9th Cir. 1991).  But King cites no authority establishing that the government must create such notes every time it interviews a prospective witness.  If the government created *no* notes, there was no Jencks material to disclose.

Next, Rule 404(b) excludes evidence of other bad acts to prove conformity therewith, but an act is not an "other act" covered by the rule if it is "inextricably intertwined" with the charged conduct.  *United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987); *see also United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th Cir. 1995).  King's statement instructing Guerrero to lie to others regarding the function of the bypass valve was part of the transaction of King's

**Memorandum Decision and Order – page 7**

charged false statement to Klimes regarding the function of the bypass valve. It was not a prior bad act and not Rule 404(b) evidence because it was a crucial event intertwined with the charged false statement. Thus, Rule 404(b) did not require pretrial disclosure. Even if the government violated a duty to disclose, King never sought to have this testimony stricken at trial, and cannot now obtain a new trial on this ground.

### c.    John Chatburn's testimony

King next asserts that the government improperly manipulated John Chatburn's testimony about King's denial of the alleged injections. King argues that Chatburn misled the jury by testifying at trial that King denied allegations of injections in general, *see* Trial Tr. p. 169, 171, 178, 187-88, 191, which King asserts is inconsistent with Chatburn's testimony at the pretrial suppression hearing that King denied allegations of injections of *wastewater*. *See* Docket No. 55 at pp. 25-26, 32.

The Court disagrees with King's characterization. Chatburn's testimony at the suppression hearing does not necessarily render his testimony at trial inconsistent or false. King may have denied both injections of wastewater (per the suppression hearing testimony) and injections of any other type of fluid (per the trial testimony). There is no inconsistency because King has cited no evidence that

**Memorandum Decision and Order – page 8**

King admitted to Chatburn, in June 2005, that he injected surface water from creeks.

King only cites an Idaho Department of Water Resources (IDWR) consent order and agreement.  *See* Docket No. 151, Exhibit 1.  The consent order does indeed contain admissions to un-permitted injections of fluids into several wells at Double C Farms, but the copy with King's name on it is unsigned.  The copy with Chris Drakos's name has a signature.  But it is Drakos's, and it is dated February 28, 2006 – long after the time when an admission by King to injecting surface water would be relevant to what King told Chatburn in June 2005.

Additionally, because King did not raise this objection at trial, the Court had no opportunity to further investigate the true nature of King's denial to Chatburn, or take steps to cure any error.  King may not now obtain a new trial on this ground.

### d.    James Stanton's testimony on the 1987 permit application

King next challenges admission of the testimony of James Stanton regarding Exhibit 1-1, which was King's 1987 permit application.  King argues the 1987 permit application was irrelevant because in 1987 the requirement for a permit for the Class V wells at issue here was only a part of state law, not Idaho's underground injection control (UIC) program approved by the EPA, effective July

**Memorandum Decision and Order – page 9**

1985.  *See* 50 Fed. Reg. 23956 (June 7, 1985).  The Court rejects this argument for two alternative reasons.

### i.    regulatory interpretation

King asserts that, because 40 C.F.R. § 144.24 (1985) authorized Class V wells by rule and required no permit to operate such wells, the EPA regulations excluded Idaho's broader permit requirement from the federally approved program. *See* 40 C.F.R. § 145.1(g)(2) (1985) (excluding from federally approved program state provisions with greater scope of coverage than minimum federal requirements).

The government disagrees because § 145.1(g)(1) allows a state to adopt requirements "more stringent" than minimum federal requirements, but does not expressly exclude "more stringent" requirements from the federally approved program.  According to the government, such more stringent state requirements may not result in a state program with a greater scope of coverage if the more stringent requirements do not expand the universe of entities that the minimum federal requirements would regulate.  The government asserts that is the case here because the federal regulations contained an inventory requirement for Class V wells at the time the EPA approved Idaho's UIC program.

The government cites cases analyzing similar regulations in another

**Memorandum Decision and Order – page 10**

statutory context.  *See Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co.*, 12 F.3d 353, 359-60 (2d Cir. 1993) (citing *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co.*, 809 F.Supp. 1040, 1048 (W.D.N.Y. 1992)); *United States v. Southern Union Co.*, --- F.Supp.2d ----, 2009 WL 2225427, at **6-8 (D.R.I. 2009).  Of these, only *Southern Union* supports the government's argument, and even that case is distinguishable on the ground that the government's interpretation there arose out of a rule-making and therefore received some deference.  King cites no authority contrary to the government's position, and the Court is aware of only one other case grappling with this question.  *See United States v. Recticel Foam Corp.*, 858 F.Supp. 726, 742-43 (E.D. Tenn. 1993) (rejecting reliance on state rule which was "broader in scope" than federal regulations because state rule increased the size of the regulated community and had no federal counterpart).

Although this is a very close issue, the Court agrees with the government's interpretation of the regulations in this case.  Beginning in 1985, Idaho's UIC program has been "enforceable by EPA pursuant to Section 1423 of the SDWA." 50 Fed. Reg. 23956 (June 7, 1985) (effective date of July 22, 1985).  Idaho's state law required a permit for Class V wells in 1985, just as it does now.  *See* I.C. § 42-3903; I.D.W.R. Rule 5,1,1 (August 1984).

**Memorandum Decision and Order – page 11**

In 1985 (and 1987), EPA regulations establishing the minimum state requirements stated "[a]ny underground injection, except as authorized by permit or by rule issued under the UIC program, is prohibited."  40 C.F.R. § 144.11 (1985); *see also* 40 C.F.R. § 144.11 (1987).  The EPA's regulations authorized Class V wells by rule, but only if the operator satisfied an inventory requirement. *See* 40 C.F.R. §§ 144.24, 144.26 (1985) (codified by 48 Fed. Reg. 14189, 14196 (Apr. 1, 1983), amended by 49 Fed. Reg. 20138, 20182 (May 11, 1984)); *see also* 40 C.F.R. §§ 144.24, 144.26 (1987).  The regulations provided that "[a]ny underground injection which violates any authorization by rule is subject to appropriate enforcement action."  40 C.F.R. § 144.25(a)(1) Note (1985); *see also id.* 40 C.F.R. § 144.25(a)(1) Note (1987).  Thus, injecting into a Class V well without satisfying the inventory requirement in § 144.26 was a federal violation, subject to enforcement action, at the time the EPA approved Idaho's UIC program.

The government is correct that the class of regulated entities did not expand by replacing the inventory requirement in the federal regulations with the permit requirement from Idaho's state law.  And, therefore, Idaho's UIC program did not have a "greater scope of coverage" for Class V wells than the federal program; it merely was "more stringent or more extensive" than the federal program existing for Class V wells at that time.  Consequently, Idaho's federally approved UIC

**Memorandum Decision and Order – page 12**

program included a permit requirement for Class V wells in 1987.

King asserts that 40 C.F.R. § 144.26 did not apply in January 1987 when King applied for a permit because the copy of that regulation provided by the government at trial was apparently from an edition of the federal regulations in effect after January 1987.  This argument lacks merit because the Court is not bound by the copy of the regulations provided by the government at trial.

Next, King relies on a 1985 statement by the Idaho Attorney General (AG Statement), referred to in the EPA publication of approval of Idaho's UIC program. *See* Docket No. 139, Exhibit B at p. 31.  King selectively quotes the AG Statement for the proposition that there could not be criminal prosecution under Idaho law for injection into a Class V well.  However, the AG Statement states also, in a passage not cited by King, that "if an operator violates an [injection well] rule, which includes a violation of a permit condition, then the operator would be subject to a misdemeanor prosecution. . . ."  *See* Docket No. 139, Exhibit B at pp. 31-32. Nevertheless, the Idaho Attorney General had no authority to rewrite the plain meaning of the EPA regulations.  The Court respectfully concludes the AG Statement is incorrect to the extent it is inconsistent with the analysis set forth above.

For the first time in his reply brief, King argues that § 144.26 was fatally

**Memorandum Decision and Order – page 13**

ambiguous as to the existence of an inventory requirement.  King notes that in referring to the deadline for compliance, the first paragraph of § 144.26 mistakenly included a typo citing § 144.26(c), which pertains only to a state's obligation to provide notice to existing operators.  The Court rejects King's argument because this minor ambiguity – which was conclusively clarified by § 144.26(d)'s clear language creating a one-year deadline to inventory an existing well – does not eliminate the regulatory burden of the inventory requirement or the scope of coverage of the federal regulations.

Also in his reply brief, King now argues that the government failed to lay an adequate foundation for Exhibit 1-1 by establishing that the federal or state authorities provided notice of the new inventory requirements to existing Class V well operators, as required by 40 C.F.R. § 144.26(c).  However, King waived this argument by not raising it prior to admission of the exhibit.  Even if not waived, however, King's argument fails because the issue is whether Idaho's state program was broader in scope than the minimum requirements for federal approval.  *See* 40 C.F.R. §§ 145.1(c), (g) (1985); § 145.11(a)(9) (1985).  The actual requirements the EPA could have enforced in Idaho prior to approval of Idaho's program are irrelevant for this inquiry.  In any event, Stanton's testimony surely established that King received notice of the applicable permit requirement.

**Memorandum Decision and Order – page 14**

King's final new argument is that the federal regulations only imposed the inventory requirement on owners or operators of "facilities" with Class V wells, who had to submit an inventory of their wells "in the aggregate."  King argues this was narrower in scope than the requirements of Idaho state law, which regulated "a much larger community consisting of all Class V injection wells."  Although this argument is also waived, the Court disagrees with King's reading of the regulations because §§ 144.24 - 144.26 clearly applied to individual wells at facilities in 1985.

The Court concludes that Idaho's permit requirement for Class V wells was more stringent than the minimum federal requirement to inventory such wells, but it did not expand the scope of coverage of the federal program by regulating additional entities.  Thus, a federal permit requirement existed in 1987, when Stanton informed King he needed a permit to inject.

## ii.   *Cheek/Ratzlaf* **willfulness relevance**

Alternatively, the Court again holds that King's 1987 application established knowledge that the law, be it federal or state, required a permit, and the 1987 application was therefore relevant to the willfulness of the injections in 2005.  *See* Trial Tr. at pp. 536-42.  The Court instructed the jury that the willfulness element for the injection counts required the jury to find that King violated a known legal duty.  Docket No. 145, Instruction No. 13.  This instruction was from *Cheek v.*

**Memorandum Decision and Order – page 15**

*United States*, 498 U.S. 192 (1991), and *Ratzlaf v. United States*, 510 U.S. 135 (1994).

But *Cheek* and *Ratzlaf* require only that the government prove the defendant knew the *precise legal duty*, not the precise origin of the legal duty – i.e. whether it comes from the federal or state government and whether it is statutory or regulatory in nature. *See Ratzlaf*, 510 U.S. at 148-49; *Cheek*, 498 U.S. at 201. King cites no authority holding that knowledge of the precise legal duty is not enough without additional proof of knowledge of the precise statute or regulation imposing that duty. Indeed, even the dissenting opinion in *Bryan v. United States*, 524 U.S. 184 (1998), which argued for application of a *Cheek/Ratzlaf* instruction, stated that "the defendant need not be able to recite chapter and verse from Title 18 of the United States Code. It is enough, in my view, if the defendant is generally aware that the *actus reus* punished by the statute – dealing in firearms without a license – is illegal." *Bryan*, 524 U.S. at 202 (Scalia, J., dissenting).

So here, the evidence is relevant if it tends to show King was generally aware that the *actus reus* punished by the statutes – injecting without a permit – was illegal. There is simply no requirement to prove specific knowledge of the complicated federal regulations establishing the federal offense. Evidence that King applied for a permit in 1987 – be it a state or federal requirement – is

**Memorandum Decision and Order – page 16**

therefore relevant to his knowledge of the legal duty to obtain a permit for injections in 2005.

### e.      Delay in stipulating to King's admissions

King argues *Old Chief v. United States*, 519 U.S. 172 (1997), required the government to immediately accept his stipulations to committing the injections. On Sunday night, April 26, 2009, after the Court impaneled the jury and the night before opening statements at trial began on Monday morning, King proffered declarations.  He admitted that the depth of the four wells in the superseding indictment exceeded 18 feet, and that he injected water from Willow Creek or Lane Creek into those four wells on the charged dates.  *See* Docket Nos. 128, 129, 132; Trial Tr. at p. 11-16.  The government stipulated to King's admissions, but not until the second day of trial.  Trial Tr. at pp. 461-64.  King argues the delay prejudiced him by allowing the government to belabor the dispute over the injections and present the doctored testimony of Chatburn.

The Court concludes that King failed to properly raise the *Old Chief* issue. The Court never examined any of Chatburn's testimony or any other evidence in that light, and King did not dispute the Court's indication that his stipulations would not preclude evidence establishing willfulness.  *See* Trial Tr. at pp. 11-16.

Even so, it is clear now that *Old Chief* would not have required the

**Memorandum Decision and Order – page 17**

government to forego presentation of its evidence in favor of King's stipulations. In *Old Chief*, "the Court made clear that in cases in which the defendant's felon status is not at issue, then 'the prosecutor's choice [of what evidence to produce at trial] will generally survive a Rule 403 analysis when a defendant seeks to force the substitution of an admission for evidence creating a coherent narrative of his thoughts and actions in perpetrating the offense for which he is being tried.'" *United States v. Allen*, 341 F.3d 870, 888 (9th Cir. 2003) (quoting *Old Chief*, 519 U.S. at 191-92) (alteration in *Allen*); *see also United States v. Ganoe*, 538 F.3d 1117, 1124 (9th Cir. 2008).  The government's evidence of the occurrence of the injections may well have helped demonstrate King's willful intent through his concealment of the injections.  Thus, had King relied on *Old Chief* and Rule 403, the Court would have rejected King's attempt to force the government to forego presentation of its evidence.

**B.    Motion for Judgment of Acquittal**

**1.    Legal standard**

Evidence is sufficient to support a conviction, if "'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Lyons*, 454 F.3d 968, 971 (9th Cir. 2006) (quoting *Jackson v. Virginia*,

**Memorandum Decision and Order – page 18**

443 U.S. 307, 319 (1979)).

### 2.    Application

#### a.    False statement count

The government charged King with falsely telling Klimes on June 2, 2005,

that the bypass valve and pipe at ISDA well no. 5 fed a nearby irrigation pivot.

There are five elements under 13 U.S.C. § 1001: (1) a statement, (2) falsity, (3)

materiality, (4) specific intent, and (5) agency jurisdiction. *United States v.*

*Camper*, 384 F.3d 1073, 1075 (9th Cir. 2004). King challenges the government's

evidence of falsity, agency jurisdiction, and materiality.

##### i.    falsity

King asserts that, because Klimes's question was fundamentally ambiguous,

the response could not be false.

Generally, "[i]t is for the jury to decide . . . which construction the defendant

placed on a question." *United States v. Culliton*, 328 F.3d 1074, 1078 (9th Cir.

2003). Nonetheless, "[i]f . . . a question is excessively vague, or fundamentally

ambiguous, the answer may not, as matter of law, form the basis of a prosecution

for perjury or false statement." *Id.* (internal quotations and citations omitted). "A

question is fundamentally ambiguous when men of ordinary intelligence cannot

arrive at a mutual understanding of its meaning." *Id.* (internal quotation omitted).

**Memorandum Decision and Order – page 19**

But "a question is not fundamentally ambiguous simply because the questioner and respondent might have different interpretations."  *Id.* at 1079.  The Court must consider the context of the question and the answers, as well as other extrinsic evidence relevant to the defendant's understanding of the question.  *Id.*

Here, Klimes asked, "where does that valve go?"  *See* Trial Exhibit 9-67. King responded "[i]t goes to that pivot."  *Id.*  Klimes explained at trial that King and Klimes were ten to fifteen feet from the bypass valve at ISDA well no. 5 at the time of the question, and Klimes pointed at the buried valve while asking the question.  Trial Tr. at pp. 343-45.  King pointed at a nearby pivot when answering. *Id.* at p. 267-68.

The question was not fundamentally ambiguous.  People of ordinary intelligence could agree that Klimes asked King about the function of the bypass valve, and King falsely indicated the valve's function was to deliver water to the pivot.  Further, the Court instructed the jury that if it found the question to be ambiguous, King could only be guilty if he understood the question in such a manner to make his response false.  *See* Trial Tr. at p. 571.  The effect of any ambiguity was a question for the jury.

There was sufficient evidence to find that King's response was false.  The testimony of John Sharkey established that the bypass pipe could not convey water

**Memorandum Decision and Order – page 20**

from the well to the irrigation pivot because it only penetrated the outer casing of the pipe leaving the well, not the inner annulus through which the pump could transport water to the irrigation pivot.  Trial Tr. at pp. 453-55.  Further, Jose Guerrero testified that King instructed him to tell others, consistent with what King told Klimes, that the bypass valve conveyed water to the nearby irrigation pivot.  Trial Tr. at p. 387.  Also, on Shaun Carson's audio recording of King and Jose Guerrero on June 2, 2005, admitted into evidence, King instructed Guerrero to cover up the bypass valve, possibly to conceal it from Klimes.  Exhibit 10-2.  The evidence supported the finding of falsity.

### ii.    jurisdiction

King argues there was no evidence that the statement to Klimes (an ISDA official) was within the jurisdiction of the EPA on June 2, 2005, because the IDWR and the EPA operate the UIC program.

To satisfy the jurisdiction element, the false statement "need not be made directly to the government agency."  *United States v. Green*, 745 F.2d 1205, 1208 (9th Cir. 1984). "The false statement must concern the 'authorized functions of an agency or department' rather than 'matters peripheral to the business of that body.'" *United States v. Facchini*, 874 F.2d 638, 641 (9th Cir. 1989) (en banc) (quoting *United States v. Rodgers*, 466 U.S. 475, 479 (1984)).  Courts may not find

**Memorandum Decision and Order – page 21**

"jurisdiction unless a direct relationship obtains between the false statement and an authorized function of a federal agency or department."  *Id.*; *see also  United States v. White*, 270 F.3d 356, 363-64 (6th Cir. 2001); *United States v. Wright*, 988 F.2d 1036, 1038 (10th Cir. 1993).

The jury instructions on the jurisdiction element required consideration of the EPA's authority to enforce Idaho's federally approved UIC program. Trial Tr. at pp. 570-71.  They indicated also that, although EPA delegated primary enforcement authority to the IDWR, EPA retained "some authority to enforce" the program.  *Id.*  There were no factual findings for the jury to render regarding EPA's enforcement authority because the applicable regulation imposed no factual preconditions on approval of Idaho's UIC program or EPA's secondary enforcement authority.  *See* 40 C.F.R § 147.650.

Also, the Court again rejects King's assertion that the EPA could not commence criminal enforcement without first providing King and the state with notice per 42 U.S.C. § 300h-2(a)(1).  That section, by its plain terms, applies only to *civil* actions and does not restrict the federal authorities' ability to immediately pursue criminal charges.  *See* Docket No. 57 at pp. 12-13; Trial Tr. at p. 542.  The government did not need to prove it provided notice.

The jury merely had to find that King's false response to Klimes's question

**Memorandum Decision and Order – page 22**

about the bypass valve was directly related to the EPA's retained enforcement authority. The jury could infer such a finding. Although this is largely a legal question in this case, the evidence demonstrated the connection because O'Neill, Klimes, and Sharkey each testified to EPA involvement in the investigation of the illegal injections shortly after King's false statement on June 2, 2005. *See* Trial Tr. at. pp. 58-59, 64, 68, 303-05, 439-40.

King misconstrues the jurisdiction element by asserting that a direct and ongoing relationship must exist between the receiving party of the false statement (Klimes of ISDA) and the EPA on the date of the statement. Federal funding to, or regulatory control over, the recipient of the false statement may be sufficient, standing alone, to establish a direct connection between the statement and the federal agency. *See White*, 270 F.3d at 364 (quoting *Wright*, 988 F.2d at 1038-39). But it is not the only way to prove that the direct relationship existed. *See United States v. Oren*, 893 F.2d 1057, 1064 (9th Cir. 1990).

### iii.    materiality

King argues that O'Neill's testimony was insufficient to establish materiality. O'Neill testified that the EPA would not have opened an investigation into "this matter" without knowledge of King's false statement to Klimes. Trial Tr. at p. 73-74.

**Memorandum Decision and Order – page 23**

Materiality is a low bar.  "A statement is considered material if it has the propensity to influence agency action; actual influence on agency action is not an element of the crime."  *Facchini*, 874 F.2d at 643 (internal quotation omitted).  King argues that O'Neill's testimony merely established that knowledge of the false statement triggered an investigation into the false statement, not the injections.  The Court agrees that allowing the conviction to rest on such a finding would render the materiality element meaningless.  But viewing the evidence in the light most favorable to the verdict, the jury could reasonably interpret O'Neill's testimony as stating that discovery of the false statement triggered the investigation into the illegal injections, not just the false statement.  Further, there was no requirement for the EPA (or even Klimes) to believe King's statement and detrimentally rely upon it.  *See White*, 270 F.3d at 365 (false statements material because, if discovered, they would cause escalated investigation).

Finally, King is incorrect in his assertion that O'Neill only testified the false statement was material in light of the allegations of wastewater injections.  O'Neill was responding to the prosecutor's question on the effect of a lie regarding a bypass line "allowing *water* to be injected into a well without a permit."  Trial Tr. at p. 72.  The government satisfied the materiality element.

### b.    Injection counts

**Memorandum Decision and Order – page 24**

King stipulated to the occurrence of the injections, *see* Trial Tr. at pp. 462-65, and now only challenges the evidence that federal law required a permit, that he lacked such a permit, and that he acted with willful intent.

### i.      Permit requirement and federal enforcement

King asserts, as above, that Idaho's federally approved UIC program in 1985 did not require a permit for Class V wells.  King asserts that Idaho's federally approved UIC program in 2005 was a "snapshot" of the program approved in 1985.  At trial, the Court rejected this argument.  Trial Tr. at pp. 537-40.

As discussed above, the Court concludes that Idaho's permit requirement has been a part of Idaho federally approved UIC program since 1985.  Additionally, King's argument fails because, in 1999, the EPA eliminated the permit by rule authorization for Class V wells in states, such as Idaho, where the state director requires an individual permit.  *See* 64 Fed. Reg. 68546, 68566-69 (Dec. 7, 1999) (adding 40 C.F.R. § 144.84(b)(3)); *see also* I.C. § 42-3903; I.D.W.R. Rule 5,1,1 (August 1984).  Thus, even if King is correct that the EPA's authorization by rule provisions rendered Idaho's program greater in scope than the federal program in 1985, the two programs had the same scope after 1999.  After that point, 40 C.F.R. § 145.1(g)(2) could no longer exclude the permit requirement from Idaho's federally approved program.  King's "snapshot" argument fails because the SDWA

**Memorandum Decision and Order – page 25**

and the EPA regulations do not require the EPA to re-approve a state program each time the EPA expands the scope of coverage required under its regulations.

Further, the Court again rejects King's reliance on 42 U.S.C. § 300h-2(a)(1), because that section did not require the government to prove it notified King and the state prior to commencing criminal charges. *See* Docket No. 57 at pp. 12-13; Trial Tr. at p. 542.

In sum, there was a permit requirement as a matter of law in 2005, and King is not entitled to a judgment of acquittal for the government's failure to produce any evidence establishing that requirement.

### ii.    King's lack of a permit

King challenges the evidence that he lacked a permit.  A former IDWR official, John Sharkey, testified that he searched an injection well database in June 2005, and found no record of a final permit issued for any injection wells at Double C Farms.  *See* Trial Tr. at pp. 457-59.  Although he found a record of King's 1987 application, he also testified the application did not have the final stamp of approval that would be on a final permit.  *Id.*  King focuses on Sharkey's testimony that the state's database was in poor repair.  The weight to accord that testimony, however, was a question for the jury, and it does not render Sharkey's testimony insufficient to support a finding that King never obtained a permit.

**Memorandum Decision and Order – page 26**

### iii.    willful intent

King challenges the evidence supporting his willful intent by renewing his challenge to the relevance of James Stanton's testimony, and by arguing Stanton did not tell King the injections would constitute a federal felony violation.

The Court concludes, however, that there was sufficient evidence to satisfy the willfulness element.  As discussed above, the government only had to prove King acted with bad purpose to violate a known legal duty, not that he knew precisely which law imposed that duty.  Stanton at least put King on notice that *some* law imposed a permit requirement.  *See* Trial Tr. at p. 141.

Additionally, the government did not present Stanton's evidence in a vacuum.  The government presented substantial evidence also of concealment of the injections, including evidence sufficient to support a finding beyond a reasonable doubt that King lied to Klimes regarding the function of the bypass valve at ISDA well no. 5.  The evidence of concealment was highly probative of King's bad purpose and his knowledge that injecting without a permit was unlawful.

Viewing the evidence in the light most favorable to the government, the jury properly found that King committed the injections with bad purpose to disobey or disregard a known duty to obtain a permit prior to injecting any fluids.

**Memorandum Decision and Order – page 27**

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED, that Cory Ledeal King's

motion for a new trial (Docket No. 150) is DENIED.

IT IS FURTHER ORDERED, that King's motion for judgment of acquittal

(Docket No. 151) is DENIED.



DATED:  **August 29, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge